IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **NADINE VOIGT,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil No. **07-50-CJP[1]** |
| | ) | |
| **MICHAEL J. ASTRUE[2],** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**PROUD, Magistrate Judge:**

Plaintiff Nadine R. Becker Voigt contends that her physical and mental impairments have

rendered her disabled since January 10, 2003. However, the Social Security Administration,

relying on the decision of Administrative Law Judge (ALJ) Robert G. O'Blennis, found plaintiff

capable of performing work at the light exertional level (albeit with certain limitations),

including her past work as a legal secretary. Accordingly, plaintiff was denied Disability

Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD)

pursuant to 42 U.S.C. § 416(i). In accordance with 42 U.S.C. § 405(g), plaintiff, represented by

---

[1]Pursuant to 28 U.S.C. § 636(c), upon the consent of the parties to having all further proceedings in the District Court conducted before a magistrate judge, Chief U.S. District Judge David R. Herndon referred this case to U.S. Magistrate Judge Clifford J. Proud. **(Docs. 5 and 12).**

[2]On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is, therefore, automatically substituted as the Defendant in this civil action, and no further action is necessary to continue this case.

counsel, is before the Court seeking review of the final decision of the Social Security

Administration denying her benefits. **(Doc. 2).** In addition to submitting the administrative

record (R.), plaintiff and defendant have fully briefed their positions. **(Docs. 21 and 24).**

Plaintiff argues:

1.    ALJ O'Blennis failed to properly discuss and analyze whether plaintiff's condition met or equaled one of the presumptively disabling impairments in 20 C.F.R. Pt. 404, Subpt. P., App. 1, Pt. A;

2.    ALJ O'Blennis failed to consider both plaintiff's severe and non-severe impairments when determining plaintiff's residual functional capacity; and

3.    Improper weight was given to the opinion of a non-examining medical expert Dr. Vincent Francis.[3]

## The General Scope of Review

The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, *et seq*., and

20 C.F.R. pt. 404. This Court reviews the decision denying plaintiff benefits to ensure that the

ALJ's decision is supported by substantial evidence, and that no mistakes of law were made.

*See* **42 U.S.C. § 405(g).**

To qualify for DIB a claimant must be "disabled." "Disabled" is defined as the "inability

to engage in any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." **42 U.S.C. § 423(d)(1)(A).**

A "'physical or mental impairment' is an impairment resulting from anatomical, physiological,

or psychological abnormalities which are demonstrable by medically acceptable clinical and

---

[3]Both ALJ O'Blennis and plaintiff refer to "Dr. Francis Vincent," but the report at issue was made by Dr. Vincent Francis. **(*See* R. 384).**

laboratory diagnostic techniques." **42 U.S.C. §§ 423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. *See Schroeter v. Sullivan*, **977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. §§ 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g).** Thus, the Court must determine not whether plaintiff is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made. *See Books v. Chater*, **91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).** The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, **402 U.S. 389, 401 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, **103 F.3d 1384,**

1390 (7th **Cir. 1997).** Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence. ***Sample v. Shalala*, 999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled. ***Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).** If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three). If the claimant does not have a listed impairment but cannot perform his or her past work, the burden shifts to the Secretary at step four to show that the claimant can perform some other job. ***Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir.1984).**

### Relevant Procedural History and Synopsis of the Facts

Plaintiff Voigt was born in February 1958; she has a GED. **(R. 405-406).** Plaintiff applied for Disability Insurance Benefits October 7, 2004, alleging the onset of disability January 10, 2003, when she ceased working as a legal secretary. **(R.58-60).** By plaintiff's own account, that job entailed typing, walking one hour and standing one hour per eight-hour day, sitting for four hours, and lifting and carrying files (20 lbs. maximum/less than 10 lbs. frequently) a distance of 50 feet, two or three time per day. **(R. 105 and 118).** According to plaintiff, her last position– while she held it– better accommodated her back pain, in that it was less physically stressful and required less typing than other similar legal secretary positions she had held. **(R. 104 and 430).** According to vocational expert James Israel, based on plaintiff's description, plaintiff's job should be characterized as highly skilled, light work. **(R. 449-450).** Israel further explained that the Dictionary of Occupational Titles indicates legal secretarial positions can be performed at the light and sedentary levels. **(R. 453).** The skills used as a legal

secretary are also considered transferrable to general secretarial and clerical work. **(R. 450).**

Plaintiff's relevant medical history begins well before the alleged January 2003 onset date. In February 1995, a right carpal tunnel release procedure was performed; in March 1998, a left carpal tunnel release procedure was performed; and in April 1998, a right re-release was performed. **(R. 170, 225-226 and 235-236).** With respect to plaintiff's carpal tunnel issues, she was released to full duty in June 1998. **(*See* R. 239).** In January 1999, Dr. Susan E. MacKinnon concluded plaintiff, who is right hand dominant, had sustained impairment of 6% in both her right hand and upper extremity, 0% in her right wrist, 6% in her left hand and wrist, and 1% in her left upper extremity. **(R. 249).**

In 1995, based on plaintiff's complaints, cervical radiculopathy was suspected, but nerve conduction studies showed no cervical radiculopathy on either side. **(R. 185).**

In 1995, x-rays revealed curvature of plaintiff's lumbosacral spine, as well as severely narrowed disc space at L5-S1 and degenerative disc disease. **(R. 199).** In January 1998, a total laminectomy at L4-L5 was performed, with excision of the nucleus pulposis and Ray cage interbody fusion. **(R. 206-208).** According to Dr. Harlan Hunter, although plaintiff continued to have muscle spasms in her lower back and was slated for a nerve block, she had achieved maximum medical improvement and was released to work in May 1998. **(R. 265).** Dr. Hunter's final treatment note in July 1998 indicated plaintiff experienced mild paraesthesia in her right lower calf; nevertheless, plaintiff was released from treatment. **(R. 266).**

In June 2000, based on a record review in apparent connection with a Workers' Compensation claim, Dr. Bruce Schlafly, M.D., opined that plaintiff had 35% permanent, partial disability of her body as a whole, due to the combined effect of her lower back and upper

extremity impairments. **(R. 292).** Dr. Schlafly deemed plaintiff "best suited for work that does not require heavy typing as well as work that permits her to frequently change positions. She has a very guarded prognosis with regard to her low back and upper extremities." **(R. 292).**

In November 2002, plaintiff was taken to the emergency room after experiencing chest pain. **(R. 316-318).** Tests at that time suggested some obstructive airways disease. **(R. 347).** Plaintiff attributed the whole incident to acid reflux caused by taking too much Ibuprofen. **(R. 429-430).** In 2003, plaintiff consulted Dr. David T. Waldon, M.D.,regarding chronic abdominal discomfort. **(R. 362-363).** Ultrasound imaging showed no abnormal abdominal findings, including gallstones. **(R. 355).** Dr. Waldon thought plaintiff could possibly have Irritable Bowel Syndrome (IBS). **(R. 360 and 362-363).**

According to plaintiff's testimony, she left work in January 2003 because the one hour commute was too hard on her back. **(R. 407).** In addition, plaintiff explained that her hands, elbows and neck hurt, and she experienced headaches– the pain was too bad for her to work. **(R. 431).** At the time of her application, in November 2004, plaintiff indicated she could sit for 20-30 minutes at a time due to pain and stiffness in her lower back and leg, but she had to shift her weight as she sat. **(R. 126).** At that time, plaintiff was capable of cleaning her house, but she had to take frequent rest breaks. **(R. 126).** Plaintiff also continued to do some yard work, including weeding flowers. **(R. 127).**

In November 2004, plaintiff's chiropractor, Dr. Joy Carr, D.C., noted that plaintiff complained of pain in her inner thighs and problems with bladder urgency, both of which Dr. Carr linked to the L3-L4 nerve root. **(R. 370).** Dr. Carr diagnosed plaintiff as having sciatica neuralgia, cervical neuralgia, with pain in her lumbar spine, pelvis and thighs. **(R. 366).**

Plaintiff was specifically described as having vertebral ankylosis at L5-S1.  **(R. 367).**  No weakness or sensory loss was reported, but muscle spasms though her spine were noted, as well as nerve root compression.  **(R. 366).**  Plaintiff's ambulation was normal and without the use of any assistive device; plaintiff was deemed capable of standing or walking for one hour.  **(R. 366-267).**  Plaintiff had to change positions every 15-30 minutes for relief.  **(R. 367).**  Plaintiff was considered capable of lifting and carrying 10 pounds with her upper extremities.  **(R. 367).**

In December 2004, based on a record review and exam, Dr. Raymond Leung, M.D., observed that plaintiff took slightly shortened strides, but she walked 50 feet unassisted.  **(R. 374).**  Plaintiff could heel walk, toe walk, squat, and she had no difficulty getting on and off the exam table, and no paralumbar spasms were perceived.  **(R. 374).**  Her arm and grip strength were normal, and plaintiff's neck was not tender and had full range of motion.  **(R. 374).**  However, plaintiff's forward flexion of the lumbar spine was limited to 85°, and her leg strength was slightly decreased at 4+/5.  **(R.374;** *see also* **375-376).**  Plaintiff had no muscle atrophy, intact reflexes, and normal sensory function**. (R. 374).**  Dr. Leung's impressions were a history of cage placement at L4-5 for a herniated disc with a current herniated disc at L3-4, and a natural fusion at L5-S1.  **(R. 374).**

In January 2005, Dr. Vincent Francis, an agency medical consultant, reviewed plaintiff's medical records and offered a residual functional capacity assessment indicating plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for six hours out of an eight hour day; sit for six hours out of an eight hour day, and perform unlimited pushing and pulling.  **(R. 378).**  Due to a history of vertigo, plaintiff was prohibited from climbing ladders, rope and scaffolds, and she had to avoid exposure to hazards such as machinery and

heights.  **(R. 379-380).**  No limits to manipulation were noted.  **(R. 380).**  Plaintiff's history of cervical and lumbar impairments was appreciated, along with continued radiating pain and lumbar range of motion was limited to 85°, but plaintiff could still ambulate unassisted, albeit with short strides.  **(R. 384).**

In April 2005, plaintiff reported she could sit and/or perform any activity for only 20 minutes, due to pain, fatigue and weakness.  **(R. 143).**  Her only reported activity was cleaning out her car.  **(R. 144).**

In October 2005, Dr. Robert P. Poetz, D.O., performed a consultative examination and record review.  **(R. 388-395).**  The doctor observed that plaintiff ambulated with a normal gait.  **(R. 392).**  At that time, plaintiff rated her pain at eight-to-nine on a ten-scale, on a daily basis.  **(R. 392).**  Plaintiff reported taking Tylenol once per week, which "takes the edge off," but does not provide real relief.  **(R. 392).**  Plaintiff explained she cannot take anti-inflammatory drugs because she has severe acid reflux.  **(R. 392).**  Dr. Poetz noted scattered rales bilaterally in plaintiff's lungs.  **(R. 392).**  With respect to plaintiff's upper extremities, Dr. Poetz observed that plaintiff moved all her joints well, but there was significant medial atrophy.  **(R. 392).**  Plaintiff exhibited 3/5 grip strength in her left forearm, 5/5 in the right forearm, 3/5 in her left wrist and 4/5 in her right wrist.  **(R. 392).**  All lower extremity joints moved well, but decreased pinprick sensation along the median nerve was noted.  **(R. 393).**  Plaintiff's right trapezium was described as being very tight, and myospasm from C-3 to the root of the neck was recorded.  Plaintiff also exhibited myospasm of the lumbar spine, and flexion was limited to 45°; straight leg and Patrick's testing were positive for low back pain. **(R. 393).**  Dr. Poetz recognized plaintiff's prior surgeries and further diagnosed plaintiff as having right cervical radiculopathy and thoracic

outlet syndrome and recurrent right carpal tunnel syndrome. **(R. 393).** According to Dr. Poetz, "[t]he prognosis is guarded due to the length of time elapsed since the injuries and the continuance of pain in all areas of symptomology." **(R. 394).** Dr. Poetz ultimately opined plaintiff was permanently and totally disabled– unemployable in the open labor market– as a result of injuries to her neck, back, bilateral hands and wrists, and left elbow. **(R. 395).** In a March 2006 letter, Dr. Poetz stated that plaintiff's injuries were a result of over use. **(R. 400).** He strongly advised that plaintiff not work in a position requiring any repetitive motion of her upper extremities, avoid prolonged keyboarding, and prolonged standing, sitting and walking, and take frequent breaks. **(R. 400).**

In February 2006, Dr. Adam J. Sky. M.D., performed a psychiatric evaluation at plaintiff's counsel's request. At that time, plaintiff indicates she was very depressed as a result of her medical problems and becasue she can no longer participate in activities. **(R. 397).** According to plaintiff, a minimal amount of stress causes severe discomfort, anxiety and depression. **(R. 397).** She perceived her condition had gotten progressively worse over the years, particularly during the past year. **(R. 397).** Plaintiff had never seen a psychiatrist. **(R. 397).** Dr. Sky described plaintiff's mood as both fair and somewhat sad, and near tears when discussing her medical issues. **(R. 398).** No cognitive deficits were found, and Dr. Sky opined plaintiff was of high-average intelligence. **(R. 398).** Dr. Sky concluded plaintiff had major depression of a reactive nature. **(R. 398).** However, Dr. Sky recommended plaintiff not use antidepressant medication because such medication is usually ineffective in treating reactive depression. **(R. 398).** Dr. Sky opined plaintiff was not capable of any gainful employment at that time. **(R. 398).**

In February 2006, J. Stephen Dolan, a certified rehabilitation counselor, interviewed plaintiff and reviewed her medical record and opined that if Dr. Sky's evaluation is correct, the multitude of physical problems and lost ability to effectively deal with stressors would render plaintiff unemployable. **(R. 166).**

Plaintiff testified during the February 8, 2006, evidentiary hearing before ALJ O'Blennis.

According to plaintiff, upon waking she is stiff and is slow to get moving. **(R. 416).** Plaintiff described being able to dress herself and care for her own hygiene, albeit with some difficulty. **(R. 413).** Plaintiff's testimony indicated she typically goes through an entire day without lying down, but by 9:00 or 10:00 at night she is stiff again, as in the morning. **(R. 413 and 439).** Since plaintiff stopped working as a legal secretary in January 2003, almost every day she ventures to her husband's race car parts shop, where she sometimes answers the phone, and does some paperwork and socializes, but she leaves when she does not feel well. **(R. 408, 414 and 433).** Plaintiff continues to clean her house and do laundry, but she indicates she cannot keep up with chores in her usual manner. **(R. 408-409).** Plaintiff's husband helps her shop for groceries and they either eat out of have just easy meals. **(R. 409).** Plaintiff explained that she can no longer do needle work due to hand and arm pain. **(R. 409).** Plaintiff's ability to watch television and read is limited because it hurts her to sit in one position for very long, and holding things also causes pain. **(R. 409).** Similarly, standing too long causes great pain. **(R. 427).** Plaintiff takes short strides because long strides hurt and make her legs burn. **(R. 438).**

According to plaintiff, her neck hurts all the time; she gets headaches; her arm burns; her right wrist hurts all the time; her elbows hurt; and pain radiates down plaintiff's right leg to her

foot – everything she does hurts.  **(R. 417-422).**  Plaintiff reports that after surgery her hands no longer "fall asleep" while she is sleeping, but she has lost strength in her hands and she is clumsy.  **(R. 420).**  Plaintiff states she cannot raise her hands over her head without them tingling and burning.  **(R. 423).**  After back surgery, plaintiff's back still hurts all the time and she still gets stiff.  **(R. 426).**

After her surgeries, plaintiff tried prescription pain medication and shots, but she did not obtain relief.  **(R. 410-412).**  Plaintiff has never tried a pain patch or TENS unit.  **(R. 447).**  Now, plaintiff takes Tylenol and sometimes Extra Strength Tylenol, but her stomach is sensitive due to acid reflux.  **(R. 410).**  Since she stopped taking Ibuprofen, her stomach sensitivity is rare.  **(R. 434).**  When plaintiff experiences stomach upset, she takes Maalox or Mylanta. **(R. 447).**  Plaintiff explained that neither she nor her physician(s) wanted her to take stronger medication, for fear of side effects, addiction and because she could have to take medication for a long time into the future.  **(R. 428).**  According to plaintiff, she is supposed to do daily exercises, but she finds them too painful.  **(R. 416).**  Before her surgery, plaintiff saw a chiropractor for years.  **(R. 424).**  She does not want any more surgery.  **(R. 417-418).**

Plaintiff also described experiencing bladder urgency to the extent that she wet her pants.  **(R. 435-436).**  Dr. Matose told plaintiff it was related to her back problems and she would have to live with it.  **(R. 435-437).**  Plaintiff does not take any medication for this ailment.  **(R. 448).**

Plaintiff experiences vertigo whenever she lies down, or when she gets a bad cold, or water or wind in her ears.  **(R. 437-438).**  Plaintiff stated this vertigo was a reason she could not go to physical therapy.  **(R. 438).**  Plaintiff does not take any medication for vertigo.  **(R. 448).**

Lastly, plaintiff testified that she has always had sinus problems, and bronchitis.  **(R.**

**445).**  These ailments are significant because coughing and sneezing jars her back and causes headaches and has also caused her to miss work.  (R. 445).

In terms of her physical capacity, plaintiff testified she thinks she could lift 20 pounds occasionally– in a life-or-death situation; and she did not think she was capable of frequently lifting ten pounds, due to burning in her arms and neck.  **(R. 439).**  Nevertheless, plaintiff testified that she thought she probably could simultaneously lift a gallon of milk in each hand.  **(R. 413).**  According to plaintiff, she cannot stand for six hours, it would be too painful and she would have to lean on something or put her foot up.  **(R. 439-440).**  Although sitting is not as difficult for plaintiff, she testified she was incapable of sitting for six hours due to pain.  **(R. 440).**  Plaintiff was able to sit for the 30 minute drive to the evidentiary hearing.  **(R. 406).**  Plaintiff described being almost too scared to take a step for fear she would fall.  **(R. 440).**  Burning in her neck and arms prevents plaintiff from pushing and pulling with her upper extremities.  **(R. 440-441).**  Plaintiff is sensitive to cold, and vibrations cause her to tighten up.  **(R. 441).**

Plaintiff opined that work was too painful.  **(R. 444).**  Plaintiff cannot play computer games because her hands fall asleep.  **(R. 441).**  Even work as a parking lot attendant was beyond plaintiff because it would entail sitting or standing.  **(R. 446).**

Vocational expert James Israel testified regarding a series of hypothetical scenarios premised upon a person of plaintiff's age, education and work history.  The first hypothetical was based on such a person who was capable of the exertional requirements of light work– lifting 20 pounds occasionally and 10 pounds frequently, sitting and/or standing or walking for six hours out of an eight hour day.  **(R. 451).**  Additional restrictions were added regarding

climbing, balancing, stooping, and avoidance of concentrated exposure to significant vibration and extreme temperatures. **(R. 451).** Mr. Israel opined such a person could perform plaintiff's past work as a legal secretary. **(R. 452).**

In response to a second hypothetical that reduced the exertional level to sedentary work— lifting a maximum of 10 pounds, standing or walking for only 2 hours and sitting for six hours— Mr. Isreal testified plaintiff's past job could not be performed as plaintiff performed it (at the light level), but such a person could perform as a legal secretary at the sedentary level. **(R. 453).** Tens of thousands of legal secretarial, secretarial general clerical, typing and data entry jobs are sedentary. **(R. 453).** Some of those jobs are skilled, others semi-skilled. **(R. 454).**

Mr. Israel was questioned regarding additional restrictions. If a person missed more than two days per month, most months, Israel thought that person would be unemployable. **(R. 454).** An accommodation for one additional break per week was possible (in terms of quantity), but the need to spontaneously take a break during the week would be intolerable. **(R. 455).**

Mr. Israel opined that if plaintiff's testimony were taken as true, she could not work. **(R. 458-459).** However, Israel specified that his opinions regarding the hypotheticals posed to him was not based on any conclusion about plaintiff's residual functional capacity. **(R. 456).**

### ALJ O'Blennis's Decision

ALJ O'Blennis's March 30, 2006, decision denying benefits ended at step four in the analytical process, finding that plaintiff was capable of performing her past work as a legal secretary at the light exertional level, albeit with some minor restrictions. **(R. 22).**

In determining what impairments plaintiff had, and which if any were severe at the second step in the analytical process, the ALJ noted that credible subjective symptoms, and the

13

absence of objective evidence, are both part of the calculus used to evaluate credibility when determining the severity of complaints.  **(R. 16).**  In reaching the ultimate conclusion that plaintiff was not disabled, ALJ O'Blennis found that plaintiff was not credible.  **(R. 16).**  The ALJ indicated plaintiff's testimony about her daily activities and her demeanor did not help her case.  **(R. 16).**  The ALJ also did not find support in the medical records for plaintiff's allegations regarding the severity of her impairment.  **(R. 17).**  It was noted that plaintiff did not seek treatment indicative of her complaints, and she only occasionally took Tylenol.  **(R. 18).**  The ALJ also observed that plaintiff's surgeries occurred five-to-eight years prior to when plaintiff stopped working.  **(R. 18).**

At step two in the analytical process,  plaintiff was found to have "severe" impairments of natural fusion at L5-S1 and a history of cage placement at L4-L5 for a herniated disc, with current herniation at L3-L4.  **(R. 18 and 21).**   No severe impairment was found relative to plaintiff's upper extremities, lungs, stomach,  bladder, sinuses, headaches or vertigo.  **(R. 18-19).**  In addition, no "severe" mental impairment was found.  **(R. 19).**  Dr. Sky's assessment and diagnosis of major depression was given no weight.  **(R. 19).**  The ALJ reasoned that plaintiff had never sought mental health treatment; no objective evidence or observations by other examiners reflected significant signs of depression; plaintiff's testimony regarding socializing was contrary to major depression; alternative pain relief methods had not been tried; and Dr. Sky's own observations contradicted his diagnosis.  **(R. 19).**  Moreover, plaintiff had not met any of the criteria regarding the criteria for evaluating mental illness set forth in Section 404.1520a.  **(R. 19).**

At step three in the analytical process ALJ O'Blennis found: "the claimant's severe

14

impairment does not meet or equal" any of the presumptively disabling impairments listed in 20 C.F.R. § 404, Appendix 1, Subpart P. **(R. 19).** "In particular, the claimant's impairment does not meet listing 1.04 because there is no consistent medical evidence over a 12-month period of compromise of nerve root or spinal cord with signs required under the specific condition such as motor loss with atrophy or weakness." **(R. 19-20).** The ALJ also noted that none of the agency reviewing physicians had concluded plaintiff's impairment met or equaled a listing. **(R. 19).**

In determining plaintiff's residual functional capacity, ALJ O'Blennis assessed plaintiff's pain, along with her other symptoms. **(R. 20).** Although the ALJ indicated he considered all relevant evidence in the record, he specified that his assessment relied primarily on Dr. Vincent's report, as the evidence as a whole supported Dr. Vincent's conclusions. **(R. 20).** The ALJ rejected vertigo as a severe impairment, because there was an insufficient evidentiary basis. **(R. 20).** Consequently, no limitation regarding hazards was found. **(R. 20).** The assessments by Dr. Carr and Dr. Poetz were afforded no weight. **(R. 20).** Dr. Carr, a chiropractor, was not a competent medical source. **(R. 20-21).** Moreover, ALJ O'Blennis found plaintiff's treatment history inconsistent with Drs. Carr and Poetz's conclusions. **(R. 20-21).** Ultimately, ALJ O'Blennis concluded:

> The claimant has the maximum residual functional capacity to lift and carry no more than 10 pounds frequently and 20 pounds occasionally. The claimant can sit, stand, or walk for up to six hours each in an eight-hour workday. She can never climb ladders, ropes, and scaffolds. She can no more than occasionally climb ramps and stairs. The claimant can no more than occasionally balance, stoop, and crouch. She must avoid concentrated exposure to vibrations (20 C.F.R. § 404.1520.1545(e)).

**(R. 22).**

For reference:

Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

**20 C.F.R. § 404.1567(b).**

At step four in the analytical framework, ALJ O'Blennis relied on the testimony of vocational expert James E. Israel. **(R. 21).** Israel opined that a person with the aforementioned residual functional capacity and listed limitations could perform plaintiff's past work as a legal secretary; therefore, plaintiff was found not disabled at step four. **(R. 21).** The ALJ gave no weight to the competing opinion of vocational expert J. Stephen Dolan because Dolan's opinion was premised upon plaintiff's testimony and medical opinions the ALJ considered unsupported by the evidence in the record. **(R. 21).**

<u>Analysis</u>

Plaintiff Voigt does not take issue with ALJ O'Blennis's findings and conclusions regarding the first and second steps in the five-step analytical process. There is no dispute that plaintiff has not been employed since January 10, 2003, or that she has "severe" impairments of natural fusion at L5-S1 and a history of cage placement at L4-L5 for a herniated disc, with current herniation at L3-L4.

Plaintiff does take issue with the ALJ's conclusions at step three, relative to whether plaintiff's impairments meet or equal any of the presumptively disabling impairments listed in 20 C.F.R. § 404, Appendix 1, Subpart P. Plaintiff contends the ALJ did not properly discuss and

analyze this issue, thereby precluding meaningful review. Plaintiff asserts the ALJ offered only conclusory statements, merely relying on the state agency physicians' opinions. Plaintiff would also require the ALJ to explain why plaintiff does not meet or equal any listed impairment. Relying on Dr. Poetz's assessment, plaintiff argues that there is substantial evidence in the record that she met listing 1.04(C), relative to spinal stenosis and degenerative disc disease.

As a preliminary matter, it must be understood that plaintiff cites no controlling precedents, only cases from the Courts of Appeal for the Third and Tenth Circuits. Furthermore, she inappropriately attempts to shift the burden from herself to the ALJ. ***See Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004) (the claimant bears the burden of proof remains with the claimant through the forth step).** The ALJ does not have to address every piece of evidence in the record; it is enough to "build a bridge" from the evidence to the conclusion. ***Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002).** Furthermore, in accordance with Section 404.1527(f)(2), state agency physicians are deemed experts in Social Security disability evaluation, and an ALJ may rely on their opinions, provided the usual evidentiary support is present and the ALJ explains the weight given to the agency physician's opinion.

Before reaching his conclusion that plaintiff did not meet any of the presumptively disabling impairments listed in 20 C.F.R. § 404, Appendix 1, Subpart P, ALJ O'Blennis assessed the evidence in the record, comparing and contrasting the treatment notes and medical evidence with all the opinions in the record. **(R. 17-20).** Dr. Poetz had opined plaintiff was permanently and totally disabled– unemployable in the open labor market– as a result of injuries to her neck, back, bilateral hands and wrists, and left elbow. **(R. 17-20 and 395).** The ALJ found it problematic that Dr. Poetz was not a treating physician; in any event, Dr. Poetz's opinion was

characterized as being "at extreme odds with the claimant's longitudinal complaints to her treating doctors." **(R. 19).** The ALJ observed: "Were the claimant as limited as Dr. Poetz . . . indicated there is no reason her doctors would not provide treatment accordingly." **(R. 19).**

The evidence summary offered by the ALJ and Dr. Poetz's own recorded observations are clearly inconsistent with Dr. Poetz's conclusion. Dr. Poetz recorded that plaintiff could ambulate with a normal gait, and all upper and lower extremity joints moved well. **(R. 392-393).** Thus, it is curious how Dr. Poetz concluded plaintiff was totally disabled, unless he was swayed by plaintiff's subjective complaints. By plaintiff's own account, every day she ventures to her husband's race car parts shop, where she sometimes answers the phone, and does some paperwork and socializes, but she leaves when she does not feel well. **(R. 408, 414 and 433).** Plaintiff continues to clean her house and do laundry, although she indicates she cannot keep up with chores in her usual manner. **(R. 408-409).** Therefore, the ALJ's rejection of Dr. Poetz's assessment is easily understood and certainly justified, based on substantial evidence in the record.

ALJ O'Blennis's analysis specifically mentioned listing 1.04, noting there was no medical evidence that, for the requisite 12-month period, plaintiff had compromise of the nerve root or spinal cord with the required signs. **(R. 19-20).**

In order to meet Listing 1.04(C), plaintiff must have spinal stenosis or degenerative disc disease, resulting in compromise of the nerve root or the spinal cord, with:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, *and resulting in inability to ambulate effectively*, as defined by 1.00B2b.

**20 C.F.R. § 404, Appendix 1, Subpart P, Sec. 1.04(C) (emphasis added).** Listing

18

1.00(B)(2)(b) indicates the inability to ambulate effectively means an extreme limitation of the ability to walk, without the use of an assistive device, so as to carry out activities of daily life.

There is overwhelming evidence that plaintiff cannot satisfy Listing 1.04(C), in that she never lost her ability to ambulate effectively. Plaintiff acknowledges she can ambulate. **(Doc. 21, p. 7).** Even Dr. Poetz recorded in October 2005 that plaintiff ambulated with a normal gait. **(R. 392).** In November 2004, Dr. Carr observed that plaintiff ambulated normally without an assistive device. **(R. 366).** In January 2005, Dr. Francis noted plaintiff could ambulate unassisted, albeit with short strides. **(R. 384).**

Plaintiff's argument that, although she can ambulate, she cannot work, is not well taken for purposes of determining whether plaintiff meets listing 1.04(C). When one does not meet the stated requirements of a listed presumptively disabling impairment, then the analysis simply continues– the stated requirements of the listing are not disregarded as plaintiff suggests.

ALJ O'Blennis's opinion, when read as a whole, clearly builds a logical bridge between the evidence and his conclusions, particularly with respect to listing 1.04(C). Listing 1.04 is the only listing plaintiff claims she could meet. The ALJ was not required to prove plaintiff's impairment(s) did not meet each and every one of the listed impairments. The ALJ adequately explained why he discounted various opinions and opted to rely upon the opinion of Dr. Vincent Francis.

Plaintiff argues that ALJ O'Blennis failed to consider plaintiff's severe and non-severe impairments when determining plaintiff's residual functional capacity, in accordance with Section 404.1545(e). More specifically, plaintiff argues that the ALJ failed to take her pain into account, as well as her multiple surgeries for carpal and cubital tunnel syndrome. Plaintiff again

19

relies on Dr. Poetz's assessment, which indicated plaintiff was permanently and totally disabled– unemployable in the open labor market– as a result of injuries to her neck, back, bilateral hands and wrists, and left elbow. **(R. 395).** In a March 2006 letter, Dr. Poetz further stated that plaintiff's injuries were a result of over use. **(R. 400).** He strongly advised that plaintiff not work in a position requiring any repetitive motion of her upper extremities, avoid prolonged keyboarding, and prolonged standing, sitting and walking, and take frequent breaks. **(R. 400).** Plaintiff notes that plaintiff was diagnosed with "recurring" carpal tunnel syndrome. **(*See* R. 235).** Plaintiff also argues that Dr. Sky's opinion that plaintiff had depression was not factored into her residual functional capacity. Plaintiff notes that vocational expert Dolan's assessment, which took all evidence into consideration, was rejected.

It is axiomatic that the number of surgeries plaintiff had is irrelevant; it is the claimant's residual functional capacity after however many surgeries that must be established. Residual functional capacity is an *administrative assessment* of what work-related activities a claimant can perform despite his or her limitations. ***See* 20 C.F.R. § 404.1545(a); and *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001).** "In assessing the claimant's [residual functional capacity], the ALJ must consider both the medical and nonmedical evidence in the record." ***Id.*** A treating source's opinion will generally be given controlling weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record. . . ." **20 C.F.R. § 404.1527(d)(2).** But, the law does not *require* an ALJ to accord a treating physician's opinion more weight than a consulting physician's opinion. ***Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992).**

ALJ O'Blennis indicated he considered plaintiff's pain and all other symptoms. **(R. 20).** Again, the ALJ does not have to address every piece of evidence in the record; it is enough to "build a bridge" from the evidence to the conclusion. ***Sims v. Barnhart,* 309 F.3d 424, 429 (7th Cir. 2002).** Plaintiff asserts the ALJ did not even consider upper extremity limitations and pain when deciding residual functional capacity. Plaintiff completely ignores that the ALJ went through the record evidence, medical opinions and subjective statements, discounting that which was not properly supported or incredible, and then determined plaintiff's residual functional capacity.

The ALJ specifically observed that plaintiff's carpal tunnel surgeries had occurred years before the alleged onset of disability, and that plaintiff had returned to work and no subsequent records were consistent with an ongoing problem. **(R. 18).** Plaintiff was released to full duty in June 1998. **(*See* R. 239).** In January 1999, Dr. Susan E. MacKinnon concluded plaintiff, who is right hand dominant, had sustained impairment of 6% in both her right hand and upper extremity, 0% in her right wrist, 6% in her left hand and wrist, and 1% in her left upper extremity. **(R. 249).** On a somewhat related note, in 1995, based on plaintiff's complaints, cervical radiculopathy was suspected, but nerve conduction studies showed no cervical radiculopathy on either side. **(R. 185).** Even after the alleged onset date and after she quit work, plaintiff continued to do some yard work, including weeding flowers, and she performed office duties for her husband on a fairly regular basis. **(R. 127 and 408 and 414).** Dr. Poetz even observed that plaintiff moved all her upper joints well and exhibited 3/5 grip strength in her left forearm, 5/5 in the right forearm, 3/5 in her left wrist and 4/5 in her right wrist. **(R. 392).** Plaintiff testified she could probably lift a gallon of milk in each hand, simultaneously. **(R. 413).**

Moreover, plaintiff explained that her last job– since 1999– did not require constant typing, and her initial explanation for why she stopped working was that she could not tolerate the back and neck discomfort she experienced during the 50-120 minute ride to work. **(R. 104).** The ALJ rightfully removed plaintiff's unsupported subjective complaints related to her upper extremities from the residual functional capacity equation. Without plaintiff's subjective complaints, as discussed above, Dr. Poetz's opinion is unsupported. Similarly, significant portions of vocational expert Dolan's assessment must be disregarded for lack of support.

With regard to pain, the ALJ was certainly correct to observe that, although plaintiff explained she shies away from certain pain relievers due to stomach upset and fear of addiction and concerns about long-term use, there is a glaring absence of evidence of complaints about pain made to her physicians. Plaintiff testified that since she stopped taking Ibuprofen, her stomach upset was rare. **(R. 434).** Although plaintiff rated her pain as eight-to-nine on a ten-scale on a daily basis, she only took Tylenol once per week– a drug that she does not indicate causes stomach upset. **(R. 392).** There is simply a lack of support for specifically factoring pain into the residual functional capacity assessment.

Dr. Sky's opinion that plaintiff had severe depression was given no weight by the ALJ; consequently, depression was not factored into the residual functional capacity assessment. **(R. 19).** Dr. Sky's assessment was based entirely on plaintiff's subjective statements. The problem is that there is a stunning absence of any other evidence of depression in the record, which is itself clear and convincing evidence. Therefore, the ALJ's decision not to include depression in the equation was entirely appropriate and consistent with the evidence int eh record– or lack thereof. Vocational expert Dolan's opinion specified that it was contingent upon Dr. Sky's

assessment being correct, which it was not.  **(R. 166).**

Plaintiff argues that in making the residual functional capacity assessment, improper weight was given to the opinion of non-examining medical expert Dr. Vincent Francis.  Plaintiff discounts Dr. Francis's opinion because it was on a pre-printed form with few notes.  Plaintiff contends the ALJ was "playing doctor" and substituting his own judgment for that of medical experts.  As noted above, in accordance with Section 404.1527(f)(2), state agency physicians are deemed experts in Social Security disability evaluation, and an ALJ may rely on their opinions, provided the usual evidentiary support is present and the ALJ explains the weight given to the agency physician's opinion.  An ALJ weighs conflicting evidence from medical experts, and a reviewing court may not re-weigh the evidence.  *Young v. Barnhart*, **362 F.3d 995, 1001 (7th Cir. 2004).**  "An administrative law judge can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice."  *Gudgel v. Barnhart*, **345 F.3d 467, 470 (7th Cir. 2003).**

ALJ O'Blennis stated in relevant part:  "*In particular*, the undersigned considered the assessment from Francis Vincent, M.D., the non-examining State agency medical consultant, from which the undersigned derived *most* of the claimant's residual functional capacity...."  **(R. 20 (emphasis added)).**  The ALJ further specifies that he considered:  plaintiff's pain and other symptoms, insofar as they were credible; and all the evidence as discussed in the decision.  **(R. 20).**  The ALJ then explained: "The undersigned gives Dr. Vincent's assessment weight because the evidence as a whole supports it."  **(R. 20).**  One need only read the detailed analysis of the evidence to conclude that ALJ O'Blennis did not simply rely on Dr. Francis's assessment.  The

ALJ considered Dr. Francis's assessment to be generally consistent with the assessment by Dr. Leung, who did actually examine plaintiff. **(R. 20; and R. 372-376).** Dr. Francis's opinion was consistent with the evidence, whereas the opinions of Drs. Poetz and Sky were, as detailed in other sections of this order, not properly supported.

ALJ O'Blennis's residual functional capacity conforms with Section 404.1545 and reflects what plaintiff is able to do despite her impairments and what is reasonable in light of the subjective and objective evidence. ***See* 20 U.S.C. §§ 404.1529, 404.1545 and 404.1546.**

**IT IS HEREBY ORDERED** that, for the aforestated reasons, the decision of the Commissioner of Social Security denying plaintiff Nadine Voigt Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423, or even a Period of Disability (POD) pursuant to 42 U.S.C. § 416(I) is **AFFIRMED** in all respects. Judgment shall enter accordingly.

**IT IS SO ORDERED.**

**DATED: March 28, 2008**

s/ Clifford J. Proud
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**
